| | | |
|---|---|---|
| Michelle Martin, | ) | |
| | ) | No. 11 C 8648 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| The Sutton Corporation, d/b/a | ) | |
| Seattle Sutton's Healthy Eating, An | ) | |
| Illinois Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Michelle Martin ("Martin") alleges that her former employer, Defendant Sutton Corporation, d/b/a Seattle Sutton Healthy Eating ("SSHE"), discharged her in retaliation for reporting racially derogatory remarks by another employee, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* SSHE moves for summary judgment. R. 33. For the reasons below, SSHE's motion is granted.[1]

### Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317,

---

[1] Per Martin's request in her response to SSHE's motion for summary judgment, R. 36 at 2 n. 2, the Court dismisses Count I of her complaint—the hostile work environment claim.

322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The facts are construed in the light most favorable to the nonmoving party, Ms. Martin. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). The Court gives Martin the "benefit of conflicts in the admissible evidence and favorable inferences from that evidence" but does not vouch for them. *Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012).

## Background

Martin is a Caucasian woman. R. 38 at 2 ¶ 9. In October 2001, Martin was hired by SSHE as a maintenance supervisor. R. 38 at 1 ¶ 1. Martin was promoted to packing room supervisor in 2002 or 2003 and promoted to co-head packing room supervisor[2] one year later. *Id.* at 1 ¶ 2, 11 ¶ 4. In November 2005, Martin and co-workers Penni Vanderbrook, Brian Emerson, and Tammy Bridges were having a discussion about college applications in the supervisors' office. R. 38 at 3 ¶ 22.

---

[2] While Martin describes her position as co-head packing room supervisor, her duties included managing employees she describes as "the other supervisors." R. 39 at 7 (19:13-16).

Vanderbrook and Emerson are Caucasian. *Id.* at 2 ¶ 9. When Vanderbrook, Martin's co-head packing room manager, *id.* at 1 ¶ 3, asked how [the] admissions [department] would know if an applicant was black or white, Emerson, a manager at SSHE, *id.* at 2 ¶ 6, laughed and responded, "Because you can spell." *Id.* at 3 ¶ 23. Martin believed that Emerson's response was directed at Bridges, an African-American, who was the preparation room supervisor. *Id.* at 2 ¶¶ 8, 10, at 4 ¶ 24.[3] Martin was offended and immediately left the building. *Id.* at 13 ¶ 13. Martin claims that she, Bridges, and Vanderbrook found Emerson's comment to be "very racially offensive." *Id.* The next day, Emerson approached Martin at the direction of Sara Herrin, the human resources director, to apologize. *Id.* ¶¶ 14, 16; R. 38 at 2 ¶ 5. Emerson instead "told a random story about donating clothes as a child to poor African[-]American individuals." R. 38 at 13 ¶ 14. Martin became further offended and told Emerson that she was going to inform Kathy Tuntland, a part-owner and the director of operations of SSHE, also Caucasian, of the same. *Id.* at 13 ¶ 14.

The next day, Martin told Tuntland, who is now deceased, about Emerson's spelling comment, that she was very offended by it, and that Emerson further offended her after he approached her that morning to apologize. R. 40 at 5 ¶ 15. Martin was also present when Bridges complained to Tuntland about the spelling

---

[3] Martin objects to SSHE's use of the term, "believes" for lack of foundation, arguing that it is conclusory and speculative. R. 38 at 4 ¶ 24. While this objection is somewhat perplexing as a term such as "belief" does not necessarily demonstrate speculation, the Court will assume for purposes of summary judgment that the comment was directed at Bridges. *See, e.g. Bright v. Wal-Mart Stores, Inc.,* No. 96 C 50140, 1998 WL 160859, at *2 (N.D. Ill. Apr. 6, 1998) ("terms such as 'felt,' 'believe' or 'seemed' or similar terms do not necessarily demonstrate speculation.")

comment, which she says took place before her conversation with Tuntland. *Id.* ¶ 17. Within a week or two, Martin also complained to Herrin about Emerson's spelling comment and told Herrin it offended her. *Id.* ¶ 16. Herrin is also Caucasian. R. 38 at 2 ¶ 9.

Martin was also aware of another comment that Emerson made sometime prior to the spelling comment, though she was not present for it. R. 38 at 14 ¶ 18. Bridges told Martin that Emerson saw Bridges coming out of a dark room and made a comment to her that he would not have been able to see her had she not been smiling. *Id.* Martin was "not as much" offended by the comment, but believed it was very offensive to Bridges, who told her that she also found the comment racially offensive. R. 39 at 12 (38:23-40:19). Martin never complained to anyone about that comment, *id.* at 12 (40:13-16), and did not know if Bridges ever complained. *Id.* at 12 (40:17-19).[4]

Martin said that she was also present when Tammy Blacklaw, who was directly below Tuntland at SSHE and to whom Martin reported in 2001, made a racial comment during a conversation between Blacklaw, Martin, and Bridges at some point during Martin's employment. R. 39 at 6 (14:1-9), 13 (43:10-44:3). Blacklaw is Caucasian. R. 38 at 2 ¶ 9. The comment was sometime before the spelling comment, though Martin does not recall the year. *Id.* at 13 (44:8-12). They

---

[4] Martin testified that the timing of Emerson's comment to Bridges about coming out of a dark room was "just before [the spelling comment] . . . months, maybe." R. 39 at 12 (38:23-39:7). However, in her declaration, Bridges states that the "smiling" comment by Emerson took place after the spelling comment. R. 33-9 at 3 ¶ 12. For summary judgment purposes, the Court assumes that Martin's account is true.

were in the supervisor's office and Blacklaw was referring to some work her husband was doing on a car and said he "nigger-rigged" it while repairing it. *Id.* (42:24-44:3). Martin told Blacklaw that the word she used was offensive and Blacklaw apologized immediately. R. 38 at 14 ¶ 19, 5 ¶ 35. Martin did not complain about or report this comment to anyone at SSHE, *id.* ¶ 36, and did not recall Bridges saying anything to Blacklaw about it at that point. R. 39 at 13 (45:1-3).[5]

Prior to Martin's November 2005 complaint about the spelling comment, she was not required to close[6] on Tuesday and Saturdays, which meant she got off of work by 3:00 p.m. so that she could attend her daughter's baseball games. R. 40 at 5 ¶ 23; R. 39 at 16 (57:16-22). After Martin complained and when she returned from SSHE's shutdown at Christmas in 2005, she had to close on one Saturday prior to her termination in February 2006. R. 40 at 6 ¶ 24. She never complained to anyone

---

[5] SSHE objects on the basis of materiality to Martin's statement of facts in paragraphs 13, 14, 18 and 19 related to Martin's reactions to Emerson's spelling comment and his prior "smiling" comment, as well as Blacklaw's "nigger-rigged" comment. SSHE claims that these statements are no longer relevant because Martin requested that her hostile environment claim be dismissed, *see* R. 40 at 5 ¶¶ 13, 14, 18, 19, but SSHE does not offer evidence to rebut these assertions and the Court deems them admitted. *See Fenje v. Feld*, 301 F. Supp. 2d 781, 818 (N.D. Ill. 2003) *aff'd*, 398 F.3d 620 (7th Cir. 2005) ("Objecting to materiality does not deny a fact. If that were the only objection, the fact would be deemed admitted . . . though its materiality would still be a legal issue going to the merits of the summary judgment motion.") (citing L.R. 56.1(b)(3)(B); *Richter v. Village of Oak Brook,* No. 01 C 3842, 2003 WL 22169763, at *4 nn. 14, 16 (N.D. Ill. Sept. 19, 2003)). Because SSHE offers no other basis for objection, these facts are deemed admitted. The Court considers the statements to the extent they are relevant to Martin's retaliation claim.

[6] Martin describes "closing time" as "when the last meal is shipped and out of the packing room. That could be anything." R. 39 at 16 (56:18-21). The time for closing could vary from 8:00 p.m. to 12:00 a.m. *Id.* at 16 (56:22-23), 16-17 (57:23-58:2).

at SSHE about the schedule change. R. 38 at 6 ¶ 44. Also after Martin's complaints about Emerson's spelling comment, Tuntland, Emerson, and Blacklaw stopped communicating with Martin. R. 40 at 6 ¶ 25. The lack of communication made it difficult for Martin to perform her job duties. *Id.* Additionally, prior to Martin's complaints, she performed reviews for the supervisors in the packing room. *Id.* at 6 ¶ 26. After her complaints, Martin no longer performed reviews of her subordinates. *Id.* ¶ 27. That responsibility was also taken away from Bridges. R. 38 at 6 ¶ 47.

In the fall of 2005, prior to the spelling comment, SSHE offered a paid vacation package to the head supervisors—Martin, Bridges, and Vanderbrook. R. 40 at 5 ¶ 21. Bridges and Martin chose a cruise option for their trip. *Id.* Martin testified that after she complained about the spelling comment, SSHE cancelled Martin's cruise in or around December 2005, although it was already been planned. R. 39 at 14 (47:17-19). Vanderbrook chose not to go on a cruise, and it is unknown if she ever went on any vacation at the time. R. 38 at 7 ¶ 56. SSHE had offered Martin a vacation package in Disney World in Florida on one other occasion in 2003 or 2004. R. 38 at 7 ¶ 52. Herrin, who was human resources director, was not aware of SSHE's offer to Martin to go on a cruise until Martin's termination hearing. R. 38 at 8 ¶ 57. Although Martin did not go on the cruise, she still received her scheduled paid time off during that time. R. 38 at 8 ¶ 58. Martin did not complain about or report that she was not able to go on the cruise to anyone at SSHE until her conversation with Herrin on the date of her termination. *Id.* ¶ 59.

At some point, a new performance review process for the supervisors was discussed by SSHE that would potentially change the review process from two reviews and two raises per year, to one annual review and one raise. R. 38 at 8 ¶ 62. Martin learned of the new policy when the hourly supervisors[7] inquired about it. *Id.* ¶ 63. Martin allowed the supervisors to meet about the new policy on performance reviews. *Id.* ¶¶ 68, 69. Herrin testified that Martin was unhappy about the changes in the performance review process and the timing of raises and had talked to some of the hourly supervisors about her concerns and encouraged them to sign a petition.[8] R. 37-1 at 15 (48:8-14). According to Herrin, Emerson indicated to her that Martin was instigating a rebellion and that Martin was the leader of the rebellion.

---

[7] Martin refers to the hourly supervisors as all the supervisors who were below her, Vanderbrook, and Bridges. R. 39 at 18 (63:22-64:10).

[8] While Herrin did not testify what the petition would demand, Emerson testified that another employee, Jeremy Grieves, told him that it would be a list of demands to present to Herrin. R. 33-3 at 18 (58:13-17). While Martin objects to SSHE's allegation about what Grieves told Emerson the list of demands would entail, R. 38 at 9 ¶ 65, as inadmissible hearsay and improper citation, statements regarding Martin's potential involvement in organizing the supervisors need not be offered to show her involvement or intentions, but rather to explain subsequent actions regarding Martin's employment. If offered for that limited purpose, the statements are not offered for their truth and are therefore not hearsay. Fed. R. Evid. 801(c)(2); *Wilke v. Salamone*, 404 F. Supp. 2d 1040, 1045 (N.D. Ill. 2005).

With respect to Martin's objection based on "improper cite" (presumably because SSHE cites to the incorrect page in Emerson's deposition to support paragraph 65 of its statement of fact), the Court will consider the facts to be supported by the correct citation, which it finds at R. 33-3 at 18 (58:13-17). *See, e.g., Mayes v. City of Hammond*, 442 F. Supp. 2d 587, 598 (N.D. Ind. 2006) ("In instances in which the citation to the evidence of record is incorrect, but the Court comes across the proper citation in the course of reviewing the remaining facts, the Court will consider the facts to be supported by the correct citation."). It is clear to the Court that SSHE plaintiff was merely careless in citing to the wrong line numbers and the relevant information was supported by another page in the deposition.

*Id.* (49:4-13). Emerson testified that he personally observed Martin in a meeting with the supervisors. R. 38 at 9 ¶ 67. In Martin's termination meeting, Herrin alleged that Martin organized the supervisors against the company and Herrin told Martin that one of the bases for her termination was for organizing the supervisors. R. 39 at 17 (61:9-16), 18 (62:7-16).

Herrin also testified that other employees informed her of Martin's involvement in a number of conflicts with other employees and that she received complaints about Martin's behavior. *Id.* at 10 ¶ 75. Herrin testified that these were factors in her decision to terminate Martin. *Id.* Martin had previously received and signed a March 11, 2003 disciplinary report from Vanderbrook that discussed Martin's alleged improper confrontation of the crew in the packing room. *Id.* at 2 ¶ 15; R. 33-6 at 2-3.[9]

In 2005, even though Herrin did not personally observe Martin organizing the supervisors, Emerson informed Herrin that Martin was doing so. R. 40 at 6 ¶ 35. Herrin testified that she discussed with Emerson what disciplinary action would be appropriate for Martin based on her organizing the supervisors and instigating their rebellion. R. 37-1 at 15 (48:23-50:1). While Herrin could not recall what

---

[9] Martin admits to receiving and signing the disciplinary report, but objects to SSHE's statement that Vanderbrook "issued a disciplinary report to her for improperly confronting the crew and that she was directed to work on her people skills," and the report itself as hearsay. R. 38 at 2 ¶ 14. Statements directing Martin to work on her interpersonal skills or about improperly confronting the crew need not be offered to show the quality of her work or management, but rather to explain subsequent actions regarding Martin's employment. As noted, if offered for that limited purpose, the statements are not hearsay. Fed. R. Evid. 801(c)(2).

Emerson said, she felt that Martin should be terminated, and Emerson agreed. *Id.* Upon learning that information, Herrin decided to terminate Martin's employment without discussing the incident with her. R. 40 at 7 ¶ 38. No investigation was performed. *Id.* Martin was terminated on February 7, 2006. R. 38 at 10 ¶ 74. At her deposition, Herrin testified that in addition to Martin, both Bridges and Vanderbrook were allegedly also accused of organizing the supervisors. R. 40 at 7 ¶ 37. However, neither was terminated or disciplined at the time. *Id.* Bridges was laid off from SSHE at some point after Martin was terminated. R. 38 at 2 ¶ 8.

On September 21, 2011, the EEOC issued Martin a right-to-sue letter. R. 1-1. Martin filed her lawsuit on December 6, 2011, raising one count of a hostile work environment (Count I) and one count of retaliation (Count II), both in violation of Title VII. R. 1.

## Analysis

### I. Title VII Retaliation Claim

Martin alleges that SSHE violated Title VII by firing her in retaliation for reporting Emerson's spelling comment. R. 36 at 3. Martin did not report the other two comments described in her complaint, one of which she was present for (Blacklaw's "nigger-rigged" comment) and one of which she was not (Emerson's earlier "smiling" comment). R. 38 at 4-5 ¶¶ 31, 36; R. 34 at 4 ¶ 31; R. 33-1 at 12 (40:13-16). Martin also contends that SSHE engaged in additional retaliatory acts which "are evidence of Martin's 'mosaic of evidence' demonstrating that her termination was retaliatory." R. 36 at 12. Specifically, Martin points to the change

in her schedule and job duties, the ceased communications with Tuntland, Emerson, and Blacklaw at work, and SSHE's taking away the cruise it previously offered to her. R. 36 at 12-13.

Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), "seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms . . . by prohibiting employer actions that are 'likely to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 388 (7th Cir. 2012). A Title VII plaintiff may establish unlawful retaliation using either the direct or indirect method of proof. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Martin cites both methods in her response, addressed in turn below.

### A.    Direct Method

Under the direct method, Martin must demonstrate that "(1) [she] engaged in a statutorily protected activity; (2) [she] suffered a materially adverse action by [her] employer; and (3) a causal connection exists between the two." *Id.* Martin relies on a combination of circumstantial evidence to establish causation under the direct method. R. 36 at 3. There is no dispute that Martin suffered a materially adverse action as she was terminated.

### i.    Protected Activity

The parties dispute whether Martin engaged in protected activity under Title VII. Martin asserts that she engaged in protected activity when she complained to Tuntland and Herrin about Emerson's spelling comment because she believed that

conduct to be unlawful. R. 36 at 3-4, R. 39 at 14 (46:5-13). As Martin notes, she need not succeed on her hostile work environment claim—which she has asked the Court to dismiss—to make out a *prima facie* case of retaliation. However, to show that she engaged in protected activity under the first prong of her *prima facie* case, she must have "reasonably believed in good faith that the practice she opposed violated Title VII." *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752 (7th Cir. 2002) (citing *Alexander v. Gerhardt Enters., Inc.,* 40 F.3d 187, 195 (7th Cir. 1994)). Additionally, a plaintiff "must not only have a subjective (sincere, good faith) belief that [s]he opposed an unlawful practice; [her] belief must also be objectively reasonable, which means that the complaint must involve discrimination that is prohibited by Title VII." *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 707 (7th Cir. 2000).

SSHE contends that summary judgment is appropriate because an isolated incident like the spelling comment which was not actually directed to Martin is insufficient to support a reasonable belief of a Title VII violation. Martin argues that her immediate reactions to Emerson's spelling comment show her sincere and reasonable belief that it violated Title VII. After Emerson made the comment, Martin immediately left the building. R. 38 at 13 ¶ 13. The next day, Emerson approached Martin at Herrin's direction to apologize, but instead "told a random story about donating clothes as a child to poor African[-]American individuals." *Id.* ¶ 14. The next day, Martin told Tuntland about Emerson's spelling comment and that it personally offended her. *Id.* ¶ 15. The following week, Martin told Herrin that she

was offended by Emerson's comment. R. 40 at 5 ¶ 16. Martin argues that her repeated complaints demonstrate that she reasonably believed Emerson's conduct amounted to a violation of Title VII.[10]

While Martin is not a lawyer and is not, as she asserts, "privy to the intricate nuances of Title VII," R. 36 at 6, she has failed to establish that she reasonably believed in good faith that in reporting the spelling comment to Tuntland and Herrin, "the practice she opposed violated Title VII." *Fine*, 305 F.3d at 752. Under that standard, courts in this Circuit have held that "it is not reasonable to believe that isolated offensive comments violate Title VII." *Bunton v. City of Zion*, No. 11 C 3107, 2012 WL 4892847, at *7 (N.D. Ill. Oct. 15, 2012) (granting summary judgment on plaintiff's retaliation claim and citing *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 271 (2001) for the proposition that "a single isolated comment cannot remotely be considered 'extremely serious,' as our cases require") (internal quotation marks omitted); *Redmond v. Gonnella Baking Co.*, CIV.A. 12 C 1474, 2013 WL 792765, at

---

[10] Martin asserts that her awareness of Emerson's "smiling" comment, which she was not present for, supports her belief that Emerson's later spelling comment violated Title VII. R. 36 at 6; R. 38 at 14 ¶ 18. Martin also cites her reaction to Blacklaw's "nigger-rigged" comment to support the sincerity of her offense at the spelling comment. R. 36 at 5; R. 38 at 14 ¶ 19. However, Martin did not report either of these comments to anyone at SSHE—not when she reported the spelling comment or at any other time—and she identifies only her report of Emerson's spelling comment (the only comment she reported) as the basis for her retaliation claim. R. R. 33-1 at 12 (40:13-16). R. 38 at 5 ¶ 36. Because Martin must show a subjective, good faith belief that she was reporting conduct in violation of Title VII when she reported the spelling comment, the Court considers her reaction to and knowledge of these other comments to the extent they support that good faith belief. Critically, however, a plaintiff must not only have a subjective belief that she opposed an unlawful practice, "that belief must also be objectively reasonable, which means that the complaint must involve discrimination that is prohibited by Title VII." *Hamner*, 224 F.3d at 707.

*7 (N.D. Ill. Feb. 28, 2013) (rejecting retaliation claim for failure to show protected activity and noting "[i]t is also not reasonable to believe that isolated offensive remarks, like [employer's] that he does not like working with women, violate Title VII.") (citing *Buford*, No. 11 C 9261, 2012 WL 5936291, at *3 (N.D. Ill. Nov. 27, 2012)); *Buford*, 2012 WL 5936291, at *1 (citing *Bunton* and dismissing retaliation claim where African-American plaintiff complained to human resources about coworker calling an African-American employee a "bitch"); *see also O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 632 (7th Cir. 2011) (rejecting a retaliation claim for report of sexual harassment under Title VII where, although plaintiff pointed to some evidence on the record suggesting the alleged offending coworker had engaged in similar behavior on other occasions, "plaintiff's report focused on one incident of inappropriate behavior . . . [and] [n]o one could reasonably think that [the coworker] had violated Title VII through her conduct at the dinner alone.") (citing *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 889 (7th Cir. 2004)); *O'Leary v. Accretive Health, Inc.*, No. 09 C 1428, 2010 WL 234869, at *4 (N.D. Ill. Jan. 19, 2010) *aff'd*, 657 F.3d 625 (7th Cir. 2011) (citing *Breeden* and finding "a complaint of an isolated act of alleged harassment is insufficient to constitute legally protected activity for purposes of a retaliation claim"); *Ogle v. Wal-Mart Stores E., LP*, 2:09-CV-317-PPS, No. 2011 WL 4452224, at *5 (N.D. Ind. Sept. 23, 2011) ("a complaint about an isolated instance of alleged sex discrimination . . . is not protected activity for Title VII retaliation purposes.") (citing *Breeden,* 532 U.S. at 269–71).

While a district court's decisions are not binding precedent, they can of course be persuasive, as the Court finds them here. *Bouso v. Elkay Mfg. Co.*, No. 02 C 6630, 2003 WL 22410076, at *5 n.3 (N.D. Ill. Oct. 22, 2003) (citing *United States v. Reed,* 272 F.3d 950, 955 (7th Cir. 2001)). In this case, the Court finds *Bunton* to be particularly instructive as it analyzed a factual pattern with similar elements to this case. The plaintiff in *Bunton*, an African-American male police officer, complained to his deputy chief of police about incidents where one of his fellow police officers used offensive language while telling stories in Bunton's presence. Specifically, the other officer used the word "nigger" in one story and told a story about a black individual approaching a police officer who asked if they were "looking for a black guy to beat up" to which the officer responded, "yeah and you are the black guy we're going to beat up." *Bunton*, 2012 WL 4892847, at *1. The court found that "the isolated comments about which Bunton complained, none of which were addressed to him directly, [we]re . . . benign" and that "no reasonable person could believe that such a comment violates Title VII." As a result, the court granted summary judgment on Bunton's retaliation claim for failure to present evidence that his complaint was statutorily protected. 2012 WL 4892847, at *7.

As in *Bunton,* the Court finds that it was not reasonable for Martin to believe that Emerson's isolated spelling comment that she reported (and the basis for her retaliation claim), by itself or in concert with his apology to Martin the next day, violated Title VII. Accepting the facts in Martin's favor and considering the other comments (the "smiling" and "nigger-rigged" comments), the Court must assume

that she had a subjective belief that the behavior she complained of violated Title VII. Even the totality of these isolated offensive comments, however, would not allow a jury to find that Martin's belief that she was complaining about a violation of Title VII to be objectively reasonable. Because Martin's belief was not objectively reasonable, she has not met her burden on summary judgment to show that she engaged in statutorily protected conduct. *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011) ("if [plaintiff's] belief is objectively unreasonable . . . then h[er] opposition is not protected by the statute.") (citing *Lang v. Nw. Univ.,* 472 F.3d 493, 495 (7th Cir. 2006)).[11]

Because the evidence, viewed in the light most favorable to Martin, is insufficient to establish that she engaged in statutorily protected activity, the Court need not address the causal connection prong. *See, e.g., Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 459 (7th Cir. 2007) ("'Failure to satisfy any one element of the prima facie case is fatal to an employee's retaliation claim.'"(quoting *Hudson v. Chi. Transit Auth.,* 375 F.3d 552, 560 (7th Cir. 2004))). As a result, SSHE's motion will be granted.

## Conclusion

Martin has failed to demonstrate any genuine issue of material fact on her Title VII claim such that a reasonable juror could find in her favor. Therefore,

---

[11] Because proof under the indirect method also requires Martin to show that she engaged in a statutorily protected activity, her claim fails under that method as well. *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 309 (7th Cir. 2012) (reciting elements for a prima facie case of retaliation under the indirect method, including the requirement that a plaintiff have engaged in statutorily protected activity) (citing *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 663 (7th Cir. 2006)).

SSHE's motion for summary judgment, R. 33, is granted. This action is dismissed with prejudice.

ENTERED:

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: September 30, 2014